IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 1:21-CR-197** |
| | : | |
| v. | : | (Judge Conner) |
| | : | |
| **JUNIOR GONZALEZ-NANE,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

A federal grand jury charged defendant Junior Gonzalez-Nane with illegal reentry in violation of 8 U.S.C. § 1326.  Gonzalez-Nane now follows many defendants across the country in raising a constitutional challenge to Section 1326.  Specifically, Gonzalez-Nane argues Section 1326 violates the guarantee of equal protection implied in the Due Process Clause of the Fifth Amendment to the United States Constitution.  For the reasons elucidated below, we will deny Gonzalez-Nane's motion.

**I.      Factual Background & Procedural History**

According to the indictment, Gonzalez-Nane was removed from the United States on or about February 17, 2010.  He subsequently reentered the United States without obtaining permission from the United States government and was found in Huntingdon County, Pennsylvania, on April 28, 2021.  The instant indictment followed, charging Gonzalez-Nane with illegal reentry in violation of 8 U.S.C. § 1326. Gonzalez filed a motion to dismiss the indictment.  The motion is now fully briefed and ready for disposition.

## II.   Legal Standard

A defendant may move to dismiss a criminal indictment at any time before trial.  See FED. R. CRIM. P. 12(b)(3).  A motion to dismiss the indictment may allege a defect in instituting the prosecution, including improper venue, violation of the constitutional right to a speedy trial, or selective prosecution.  See FED. R. CRIM. P. 12(b)(3)(A).  A motion to dismiss may also be premised on perceived substantive deficiencies, including duplicity or multiplicity in the indictment, lack of specificity, improper joinder, or failure to state an offense.  See FED. R. CRIM. P. 12(b)(3)(B).  The court must decide every pretrial motion before trial unless good cause exists to defer its ruling.  See FED. R. CRIM. P. 12(d).

## III.   Discussion

Gonzalez-Nane claims 8 U.S.C. § 1326 violates the equal protection component of the Due Process Clause of the Fifth Amendment under the standard set by the United States Supreme Court in Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977).  (See Doc. 20 at 2).  Defendants have brought similar challenges backed by similar evidence across the United States in recent years, including in the Middle District of Pennsylvania, see United States v. Rodriguez-Arevalo, No. 1:19-CR-00281, 2022 WL 1542151 (M.D. Pa. May 16, 2022) (Wilson, J.).  To our knowledge, only one federal court among the dozens that have considered Gonzalez-Nane's arguments has found Section 1326 violates the equal protection component of the Due Process Clause.  See United States v. Carrillo-Lopez, 555 F. Supp. 3d 996 (D. Nev. 2021).  No court of appeals has yet ruled on the validity of Section 1326 from an equal protection perspective.

Section 1326 criminalizes reentry into the United States by aliens previously removed.  See 8 U.S.C. § 1326.  Section 1326 is a facially neutral criminal statute.[1]  Facially neutral statutes are generally subject to rational basis review when challenged on equal protection grounds.[2]  See Cabrera v. Att'y Gen. U.S., 921 F.3d 401, 404 (3d Cir. 2019) (citing Heller v. Doe ex rel. Doe, 509 U.S. 312, 319 (1993)).  However, facially neutral statutes are subject to greater scrutiny under equal protection principles when the statute disparately impacts a protected group and the legislative body was motivated, at least in part, by discriminatory motive.  See Arlington Heights, 429 U.S. at 265-66; Doe ex rel. Doe v. Lower Merion Sch. Dist., 665 F.3d 524, 543 (3d Cir. 2011) (quoting Antonelli v. New Jersey, 419 F.3d 267, 274 (3d Cir. 2005)).  Should the challenger meet that standard, the burden shifts to the government to show that the legislative body would have enacted the statute anyway even if it had not been motivated by impermissible purpose.  See Hunter v.

---

[1] The government contends that Section 1326 is not a criminal statute but an immigration statute and therefore subject to review under the "facially legitimate and bona fide" standard.  (See Doc. 24 at 8-10).  We reject the government's position and join with our colleague in viewing Section 1326 as a criminal statute because it carries criminal penalties.  See Rodriguez-Arevalo, 2022 WL 1542151, at *2; see also Wong Wing v. United States, 163 U.S. 228, 238 (1896) ("[E]ven aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law.").

[2] We note that the protections afforded by the equal protection component of the Due Process Clause of the Fifth Amendment and the Equal Protection Clause of the Fourteenth Amendment are equivalent.  See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 217-218, 234-35 (1995).  Hence, the standards for finding a violation of one are valid for finding a violation of the other.  See Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. ____, 140 S. Ct. 1891, 1915-16 (2020) (applying Arlington Heights to the decision to rescind the federal Deferred Action for Childhood Arrivals program).

Underwood, 471 U.S. 222, 225 (1985) (citing Arlington Heights, 429 U.S. at 271 n.21; Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). We assess whether Gonzalez-Nane and, if necessary, the government have met their respective burdens under Arlington Heights by the preponderance of the evidence. See Hunter, 471 U.S. at 225.

### A.   Disparate Impact

Gonzalez-Nane contends that Section 1326 results in a disparate impact on Latinos. (See Doc. 20 at 8). An action results in "disparate impact" when that action "bears more heavily on one [protected group] than another.'" See Arlington Heights, 429 U.S. at 266 (quoting Washington v. Davis, 426 U.S. 229, 242, (1976)). According to the Department of Justice's statistics, 98 percent of all individuals charged under Section 1326 in 2010 were of Latin American origin and more than 99 percent of those convicted under Section 1326 in 2020 were Hispanic.[3]

The government counters that this disproportionality can be explained by geography and the Latin American origin of the majority of those individuals removed from the United States. (See Doc. 24 at 11-13). The geography of the United States and the demographic makeup of the undocumented population does

---

[3] Gonzalez-Nane points primarily to two government reports as evidence of Section 1326's disparate impact on Latinos: a 2013 report discussing immigration violations from a law-enforcement perspective, see MARK MOTIVANS, U.S. DEP'T OF JUST.: BUREAU OF JUST. STAT., IMMIGRATION OFFENDERS IN THE FEDERAL JUSTICE SYSTEM, 2010 23 (2013), https://bjs.ojp.gov/content/pub/pdf/iofjs10.pdf, and another report providing a statistical breakdown of individuals arrested for violating Section 1326, see U.S. SENTENCING COMM'N, QUICK FACTS, ILLEGAL REENTRY OFFENSES (2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf. The government does not challenge the validity of the statistics cited from these reports.

4

provide some explanation for the statistics cited by Gonzalez-Nane, but the weight of the decision to criminalize reentry falls so exclusively on the Latino community that the disparity is incontestable. We join with many district courts in finding Section 1326 has a disparate impact on Latinos. See, e.g., Rodriguez-Arevalo, 2022 WL 1542151, at *4; Carrillo-Lopez, 555 F. Supp. 3d at 1005-07; United States v. Machic-Xiap, 552 F. Supp. 3d 1055, 1072-73 (D. Or. 2021); United States v. Munoz-De La O, No. 2:20-CR-134, 2022 WL 508892, at *11 (E.D. Wash. Feb. 18, 2022).

Nevertheless, disparate impact alone is not enough to invalidate Section 1326. See Davis, 426 U.S. at 242. Gonzalez-Nane must also produce evidence that Congress was motivated to enact Section 1326 by an impermissible purpose, to wit: the desire to discriminate against Latinos. See Doe, 665 F.3d at 551 (citing Arlington Heights, 429 U.S. at 266-67). Without proof of "discriminatory purpose, explicit or inferable, on the part of the [decisionmaker]," Section 1326 is "subject only to rational basis review." See id. at 544 (quoting United States v. Frazier, 981 F.2d 92, 95 (3d Cir. 1992)).

B.   **Discriminatory Purpose**

The 82nd Congress of the United States enacted Section 1326 as part of the Immigration and Nationality Act of 1952 ("INA").[4] Section 1326, along with the rest

---

[4] Gonzalez-Nane argues Section 1326 is merely a "recodification" of the Undesirable Aliens Act of 1929 enacted by the 70th Congress, which first made reentering the United States after being removed or deported a crime. (See Doc. 20 at 3, 10, 26-28, 30). Accordingly, Gonzalez-Nane insists we are obliged to focus our inquiry on the motives of the 70th Congress. (See id.) We reject Gonzalez-Nane's depiction of the relationship between Section 1326 and the Undesirable Aliens Act. Although Section 1326 borrowed much of its language from the Undesirable Aliens Act, Section 1326 is only a small part of the vast and comprehensive INA, which

5

of the INA, became law over the veto of President Harry S. Truman. (See Doc. 20-13). Under Arlington Heights, we must determine whether Gonzalez-Nane provides proof that the 82nd Congress overrode President Truman's veto to enact Section 1326 into law because it was motivated by discriminatory purpose. See Arlington Heights, 429 U.S. at 265; Doe, 665 F.3d at 543 (quoting Antonelli, 419 F.3d at 274).

Decisionmakers act with "discriminatory purpose" when they "select[] or reaffirm[] a particular course of action at least in part 'because of,' not merely in 'in spite of,'" their decision's adverse effect on a particular group. See Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979); see also Doe, 665 F.3d at 548. Merely being conscious that a particular course of action will have a disparate impact on a protected group is insufficient when the disparate impact played no "causal role" in the decision. See Frazier, 981 F.2d at 95 (citing Feeney, 442 U.S. at 279). To ascertain whether a discriminatory purpose motivated a particular legislative act, courts make "a 'sensitive inquiry' into the available 'circumstantial and direct evidence of intent,'" including (1) the nature of the discriminatory impact, (2) "the historical background of the decision," and (3) "the legislative history of the decision." Doe, 665 F.3d at 552 (quoting Arlington Heights, 429 U.S. at 266-68).

---

overhauled the entirety of our country's immigration system. The historical background of Section 1326 informs our analysis, but the commonplace legislative practice of recycling language is not enough, under these circumstances, to tether Section 1326 to the motivations of a Congress that passed out of existence more than 20 years before its enactment. We are joined in holding the 82nd Congress, not the 70th, is the proper target of our equal protection inquiry by our colleague, the Honorable Jennifer Wilson, in Rodriguez-Arevalo, and by the majority of district courts to consider the question. See Rodriguez-Arevalo, 2022 WL 1542151, at *5 n.3 (collecting cases).

### 1. *Nature of the Discriminatory Impact*

When the discriminatory impact of a particular action "cannot be 'plausibly explained on a neutral ground, impact itself would signal that the real classification made by the law was in fact not neutral.'" See id. (quoting Feeney, 442 at 275). We do not confront such a situation in the matter *sub judice*. As the government observes, plausible neutral explanations exist for the extreme disparate impact of Section 1326 on Latinos. Furthermore, "Latinos make up a large share of the unauthorized alien population" and can be expected to "make up an outsized share" of the people affected by policies targeted at unauthorized aliens without violating equal protection. See Regents, 140 S. Ct. at 1915-16 (citation omitted). Accordingly, the disparate impact of Section 1326, standing alone, fails to provide sufficient support for Gonzalez-Nane's contention that the statute was motivated by discriminatory purpose.

### 2. *Historical Background*

#### a. **History of Section 1326**

Congress first enacted a comprehensive statutory structure governing immigration in 1924 as the National Origins Act. (See Doc. 20-1 at 3-5). The National Origins Act established a system of quotas limiting the number of immigrants of any particular nationality based on the percentage of the United States population that nationality constituted in the Census of 1890. (See id.; Doc. 20-2 at 6). Influenced by sweeping bigotries, the quota system drastically limited overall immigration to the United States, heavily favored European immigration over immigration from the rest of the world, and explicitly prohibited immigration

7

by certain classes of so-called "undesirable" persons including virtually all immigrants of Asian origin. (See Doc. 20-1 at 3; Doc. 20-12 at 26:20-28:7); see also Hughes v. U.S. *ex rel.* Branzetti, 1 F.2d 417, 418 (3d Cir. 1924). However, Congress excluded the nations of the Western Hemisphere from the quota system. (See Doc. 20-1 at 3; Doc. 20-12 at 28:5-8). Consequently, while immigration from Europe, Africa, and Asia dwindled over the following years, Latin America—primarily Mexico—quickly became the dominant source of immigrants to the United States. (See Doc. 20-1 at 3).

Five years later, Congress enacted the Undesirable Aliens Act of 1929, which for the first time applied criminal penalties to individuals entering the United States outside of proper immigration channels. (See Doc. 20-2 at 2, 12). The Act subjected individuals who illegally entered the United States to a misdemeanor charge punishable by up to one year in prison, a $1,000 fine, or both. (See Doc. 20-1 at 1, 7; Doc. 20-2 at 2); see also 8 U.S.C. § 1325. Individuals who illegally reentered the United States after being previously removed faced a felony charge punishable by up to two years in prison, a $1,000 fine, or both. (See Doc. 20-1 at 1, 7; Doc. 20-2 at 2).

The immigration system established by the National Origins Act and Undesirable Aliens Act governed immigration in the United States until the early 1950s when the 82nd Congress accepted the challenge of reforming the nation's immigration system. (See Doc. 20-2 at 15). Congress's new vision for immigration ultimately became embodied in the McCarren-Walter bill. McCarren-Walter marked a complete overhaul of the American immigration system. (See Doc. 20-13

at 1; Doc. 20-2 at 19). It retained the use of national quotas but set the formula to track the more diverse Census of 1920 and applied the quota system to nations in the Western Hemisphere. (See Doc. 20-2 at 19). The bill also abolished the explicit racial prohibitions found in the National Origins Act, though the system still, on balance, favored European immigration. (See id. at 19; Doc. 20-12 at 115:17-116:7). Crucial to Gonzalez-Nane's argument, McCarren-Walter incorporated the provision from the Undesirable Aliens Act criminalizing reentry with only a slight modification to its language. See Immigration and Nationality Act of 1952, Pub. L. No. 82-414, § 276, 66 Stat. 163, 229; (see also Doc. 20-2 at 2, 20-21; Doc. 20-15).

Congress initially passed the McCarren-Walter bill only to have it vetoed by President Truman. (See Doc. 20-13; Doc. 20-2 at 19). President Truman objected to the bill as "perpetuat[ing] injustices of long standing against many nations of the world," "intensifying the repressive and inhumane aspects of our immigration procedures," and insulting to certain ethnicities and nationalities the United States counted as allies in the struggle against Communism. (See Doc. 20-2 at 1-2). Congress nevertheless enacted McCarren-Walter over Truman's veto two days later as the Immigration and Nationality Act of 1952 ("INA"), the provision criminalizing reentry becoming codified as Section 1326. See § 276, 66 Stat. at 229 (codified at 8 U.S.C. § 1326).

### b. Evidence of Discriminatory Motive

We examine Section 1326's historical background for information that "sparks suspicion of discriminatory intent." See Doe, 665 F.3d at 553. Gonzalez-Nane assembles a compelling case that Congress's enactment of Section 1326's

predecessor, the Undesirable Aliens Act, was motivated by racial and ethnic animus directed towards Latinos, particularly citizens of Mexico.  Numerous statements in the record made by the architects of the Undesirable Aliens Act make clear the animosity felt by the Act's advocates towards the "hordes" of Mexicans flooding into Texas and "com[ing] into Wisconsin in droves."  (See Doc. 20-4 at 3619). Congressman John C. Box of Texas, a prominent advocate for a eugenicist approach to immigration, referred to Mexican immigration as raising "a serious race question" and "a great race question," alleging immigrants and migrants from Mexico were a "people essentially different from us in character, in social position, and otherwise."  (See id. at 3620; see also Doc. 20-3).  Responding to a statement by Box during floor debate, another Congressman, W.T. Fitzgerald of Ohio, went so far as to refer to Mexican immigration as "poisoning the American citizen" and bringing into the United States a "class" of people that was "very undesirable." (See Doc. 20-4 at 3620).  Gonzalez-Nane also provides declarations and testimony from two academics placing the enactment of the Undesirable Aliens Act firmly in the context of the "Tribal Twenties" where ideas of Aryan supremacy and eugenicist thought pervaded the halls of American power and influenced, if not dictated, legislative decision-making, especially in the realm of immigration policy. (See Docs. 20-1, 20-2, 20-12).

    We agree with Gonzalez-Nane's observations.  The racial and xenophobic

motivations behind the Undesirable Aliens Act are glaring.[5]  However, as we have discussed, the enactment of Section 1326 as part of the INA is a legislative event distinct from the enactment of the Undesirable Aliens Act.  See *supra* at 5 n.4.  The motives behind the Undesirable Aliens Act are relevant to our analysis of Section 1326.  See Abbott v. Perez, 585 U.S. ___, 138 S. Ct. 2305, 2326-27 (2018).  But the ugly historical shadow cast by the Undesirable Aliens Act is merely one portion of the "direct and circumstantial evidence" we must weigh.  See id. at 2327.  It is only by examining "all the relevant evidence" that a court may discern whether a legislature engaged in intentional discrimination.  See id.  Repudiating a law's history of discriminatory purpose may cleanse it of its animus, but the failure to repudiate, particularly as to discrete statutory language, is not proof of animus.  See N.C. State Conf. of the NAACP v. Raymond, 981 F.3d 295, 298 (4th Cir. 2020); Cotton v. Fordice, 157 F.3d 388, 392 (5th Cir. 1998).

When Congress enacted the INA, over Truman's veto, all architects of the Undesirable Aliens Act had either died or departed from Congress.  The United States had fought and won a global war fueled in large part by eugenics and Aryan supremacy.  The Civil Rights Movement, which ultimately brought about extensive, if imperfect, enforcement of legal and social equality, was well underway and had

---

[5] The government argues the caustic statements of Box, Fitzgerald, and others were not motivated by bigotry but by concern for Americans who might lose their jobs to Mexican immigrants and migrants.  The government's contention stretches credulity past the point of breaking.  Professions of economic anxiety are the quintessential stalking horse for anti-immigrant bigotry.  See Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996) (explaining "code words" may indicate discriminatory intent).

11

already won several major legal victories, see Sweatt v. Painter, 339 U.S. 629 (1950) (ordering integration of University of Texas School of Law); McLaurin v. Okla. State Regents, 339 U.S. 637 (1950) (prohibiting discrimination in graduate and professional education); Perez v. Sharp, 32 Cal. 2d 711 (Ca. 1948) (striking down California's antimiscegenation law). American law and society were by no means freed of racial and ethnic bigotry—far from it—but to merely count the years between the enactment of the two laws belies the vast historical gulf between the 1920s and the 1950s.

We also agree with Gonzalez-Nane that reenactment does not automatically wipe a statute clean of its original sins. (See Doc. 40 at 41-43); Ramos v. Louisiana, 590 U.S. ___, 140 S. Ct. 1390, 1410 (2019) (Sotomayor, J., concurring); Espinoza v. Mont. Dep't of Revenue, 591 U.S. ___, 140 S. Ct. 2246, 2273 (2020) (Alito, J., concurring). Nevertheless, Section 1326 is not the product of mindless reenactment that unquestionably "carrie[s] forward the effects of any discriminatory intent on the part" of the 70th Congress. See Abbott, 138 S. Ct. at 2325. The 82nd Congress enacted Section 1326 as part of a vast and comprehensive piece of legislation that ushered in a new system governing immigration to the United States. (See Doc. 20-2 at 19). President Truman, for example, described McCarren-Walter in his veto statement as "an omnibus bill which would revise and codify all of our laws relating to immigration, naturalization, and nationality." (See Doc. 20-13 at 1). The Undesirable Aliens Act and Section 1326 share much of the same language, but there is nothing unusual about Congress recycling existing statutory language for new legislative schemes. See, e.g., Jerman v. Carlisle, McNellie, Rini, Kramer &

12

Ulrich LPA, 559 U.S. 573, 590 (2010) ("Congress copied verbatim the pertinent portions of [the Truth in Lending Act]'s bona fide error defense into the [Fair Debt Collection Practices Act]."); Seila L. LLC v. Consumer Fin. Prot. Bureau, 591 U.S. ____, 140 S. Ct. 2183, 2231-33 (2020) (Kagan, J., concurring) (documenting reuse of a particular for-cause removal provision in numerous state and federal statutes); In re Cmty. Bank of N. Virginia, 418 F.3d 277, 295 (3d Cir. 2005) (referring to Congress "borrow[ing]" language from another statute). The two statutes also differ distinctly, if subtly, in purpose—Congress intended them to enforce different immigration systems. Culled to its essence, Section 1326 is an old gear repurposed as part of a new engine.

To be clear, we do not hold that the historical background to Section 1326, including the Undesirable Aliens Act, is irrelevant to our analysis. Nor do we hold that the reenactment of the Undesirable Aliens Act, with slight modification, as Section 1326 cleanses Section 1326 of the bigotry associated with its predecessor. We hold that the enactment of Section 1326 as part of a comprehensive revision of immigration law in the United States significantly diminishes animus associated with the Undesirable Aliens Act.[6]

---

[6] Gonzalez-Nane insists the Supreme Court's decision in Hunter forecloses passage of time and minor modifications from curing an underlying discriminatory purpose. (See Doc. 40 at 43 (citing Hunter, 471 U.S. at 233)). We disagree. In Hunter, the only adjustments to the statute in question were imposed by the judiciary. See Johnson v. Governor of Fla., 405 F.3d 1214, 1222 (11th Cir. 2005) (citing Hunter, 471 U.S. at 233). Here, Congress, not a court, took affirmative action to reenact *and* revise Section 1326 in 1952. (See Doc. 20-2 at 20-21; Doc. 20-15); see also § 276, 66 Stat. at 229. Congress has also continued to affirmatively revise the language of Section 1326 over the interceding decades. See, e.g., National Narcotics Leadership Act of 1988, Pub. L. No. 100-690, § 7345, 102 Stat. 4181 (adding enhanced

### 3. *Legislative History*

As Professor Benjamin Gonzalez O'Brien points out in his declaration, the legislative history concerning Section 1326 is "scant." (See Doc. 20-2 at 20, 25). During the debates over McCarren-Walter, Congress engaged with the substance of Section 1326 only once. (See id. at 20; Doc. 20-12 at 181:14-182:9). Nonetheless, Gonzalez-Nane contends that there is sufficient proof of animus in the legislative history of Section 1326 to satisfy Arlington Heights' threshold question. (See Doc. 40 at 31).

Gonzalez-Nane suggests three events provide compelling indicia of Congress's continued desire to discriminate against Latinos. (See id. at 36-41). First, he points to the single discussion of Section 1326 in the Congressional Record. As Congress was drafting McCarren-Walter, Deputy Attorney General Peyton Ford sent a letter to Senator Pat McCarren, one of McCarren-Walter's namesakes, requesting numerous changes to the language of the bill. (See Doc. 20-14). One of Ford's requests concerned the language of the provision that became Section 1326. (See Doc. 20-2 at 20-21; Doc. 20-14 at 6). Ford sought to change the language of the provision slightly to make it easier to establish the proper venue for prosecuting individuals accused of illegal reentry. (See Doc. 20-2 at 20-21; Doc. 20-14 at 6; Doc. 20-12 at 100:20-101:20). McCarren complied with Ford's request and changed the language. (See Doc. 20-2 at 20-21; Doc. 20-15); see also § 276, 66 Stat. at 229.

---

penalties for aliens with prior felony convictions); Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1267-68 (adding severe penalties for illegal reentrants previously removed for terrorism-related reasons).

14

Also included in Ford's letter is the racial slur "wetback." (See Doc. 20-14 at 8). Gonzalez-Nane claims Ford's use of the slur combined with McCarren's acquiescence to Ford's request is compelling proof of Congress's continued discriminatory purpose. (See Doc. 20 at 27, 36). The presence of a racial slur in official intergovernmental correspondence is an embarrassing historical fact, but Gonzalez-Nane oversells the significance of the slur in signaling the motivations of Congress. Ford does not invoke the slur—rather, it appears in a quotation from a report of the President's Commission on Migratory Labor. (See Doc. 20-14 at 8). In the report, the Commission asserts that "[s]tatutory clarification on the above points will aid in taking action against the conveyors and receivers of the wetback." (See id.) This reference to a "statutory clarification" has nothing to do with Section 1326; the passage refers to a different part of McCarren-Walter. The use of the slur in the quoted passage casts the shadow of bigotry on the Commission on Migratory Labor, and Ford's casual inclusion of the quotation in his letter can be read to impugn Ford with a certain degree of bigotry. The presence of the slur in Ford's letter, however, does not speak to the motivations of Congress or even McCarren in acquiescing to a different request by Ford.

Second, Gonzalez-Nane points to Truman's veto statement attacking the "injustice" and "inhumane aspects" of McCarren-Walter. (See Doc. 20 at 37-28). However, Truman attacks McCarren-Walter because of the bill's use of national quotas. (See Doc. 20-13). He makes no mention of Section 1326 or any other criminal enforcement mechanisms within the bill. (See id.) Truman's statement

provides no support to the contention that bigotry motivated Congress's decision to enact Section 1326, as part of McCarren-Walter, over Truman's veto.

Lastly, Gonzalez-Nane points to the enactment of Senate Bill 1851, also known as the Act of March 20, 1952, two months before the enactment of McCarren-Walter.  (See Doc. 20 at 36; see also Doc. 20-2 at 16-17; Doc. 20-12 at 89:9-15); Act of March 20, 1952, Pub. L. No. 283-108, 66 Stat. 26.  Senate Bill 1851 sought to impose penalties on individuals, but not employers, who harbored and conveyed undocumented immigrants.  (See Doc. 20-2 at 16-18; Doc. 20-12 at 97:16-98:9).  According to Professor Gonzalez O'Brien, the nickname for Senate Bill 1851 among congresspeople was the "Wetback Bill."  (See Doc. 20-2 at 16-17; Doc. 20-12 at 89:9-15).  The casual usage of a racial slur in the nickname for a congressional bill is yet another historical embarrassment, but Senate Bill 1851 is not McCarren-Walter.  While Senate Bill 1851's nickname may reflect discriminatory intent in its enactment, it is not evidence of discriminatory intent in separate and distinct statutory enactments.  We conclude that common use of a sordid nickname for legislation passed two months before McCarren-Walter is too removed in time and context to "raise a plausible inference" that McCarren-Walter was "motivated by animus."  See Regents, 140 S. Ct. at 1916 (citing Arlington Heights, 429 U.S. at 268).

    4.    *Assessment of Evidence*

Ascertaining "the motivation behind official action is often a problematic undertaking."  See Hunter, 471 U.S. at 228 (citing Rogers v. Lodge, 458 U.S. 613 (1982)).  When the target of the inquiry is "the actual motivations of the various legislators that produced a given decision," the difficulty of the inquiry only

16

increases. See id. Moreover, the stakes in equal protection challenges to criminal laws are "sufficiently high" that courts must "eschew guesswork." See United States v. O'Brien, 391 U.S. 367, 384 (1968). Taking into consideration all the relevant evidence discussed above, we find there is insufficient proof the 82nd Congress was motivated, even in part, by a discriminatory purpose in enacting Section 1326. See Arlington Heights, 429 U.S. at 266-67. As clear as the motivations of the 70th Congress might be in enacting the Undesirable Aliens Act, the motivations of the 82nd Congress in enacting Section 1326 are simply unclear from the record presented. See O'Brien, 391 U.S. at 384 ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it."). The indicia of animus drawn from Section 1326's historical background is not valueless, but evidence of past discrimination, alone, does not "flip the evidentiary burden on its head." See Abbott, 138 S. Ct. at 2325. Consequently, Gonzalez-Nane has not met the threshold requirement. See Arlington Heights, 429 U.S. at 265-66. Section 1326 is subject only to rational basis review. See Doe, 665 F.3d at 544.

### C. Rational Basis Review

Rational basis review is "very deferential" to the government. See Newark Cab Ass'n v. City of Newark, 901 F.3d 146, 156 (3d Cir. 2018). The challenged law should be upheld "'if there is any reasonably conceivable state of facts that could provide a rational basis' for the differing treatment." See id. (quoting United States v. Walker, 473 F.3d 71, 77 (3d Cir. 2007)). The party challenging the law "must negate every conceivable justification for the classification in order to prove that the

17

classification is wholly irrational." Cabrera, 921 F.3d at 404 (quoting Brian B. *ex rel.* Lois B. v. Commonwealth of Pa. Dep't of Educ., 230 F.3d 582, 586 (3d Cir. 2000)). In assessing an equal protection claim under rational basis review, the court may consider any conceivable purpose that could support the law and is not limited to justifications advanced by the government. See Connelly v. Steel Valley Sch. Dist., 706 F.3d 209, 216 (3d Cir. 2013).

Section 1326 satisfies rational basis review. The government has a legitimate interest in ensuring compliance with its immigration laws, especially those related to entering the United States. See Rodriguez-Arevalo, 2022 WL 1542151, at *7 n.5. Criminalizing the violation of certain immigration laws tends to promote greater compliance with the law. Likewise, applying a more severe penalty to individuals who engage in illegal reentry comports with the traditional criminal justice practice of applying greater penalties to repeat offenders and can reasonably be expected to deter violations.

### IV. Conclusion

For the above reasons, we find Gonzalez-Nane has not met the substantial burden required for invalidating Section 1326 under the equal protection component of the Fifth Amendment. Accordingly, we will deny Gonzalez-Nane's motion to dismiss the indictment. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:   July 28, 2022